UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF OHIO
WESTERN DIVISION

| | | |
|---|---|---|
| **JULIE PERRINO** | : | CASE NO.   1:23-cv-00079 |
| C/O BARRON, PECK, BENNIE, | | |
| & SCHLEMMER | : | JUDGE |
| 3074 Madison Road | | |
| Cincinnati, OH 45209 | : | **VERIFIED COMPLAINT FOR** |
| | | **INJUNCTIVE AND DECLARATORY** |
| Plaintiff | : | **RELIEF AND MONEY DAMAGES** |
| | | |
| -vs- | : | |
| | | |
| **THE WEST CHESTER TOWNSHIP** | : | |
| **BOARD OF TRUSTEES** | | |
| 9113 Cincinnati Dayton Rd, | : | |
| West Chester Township, OH 45069 | | |
| | : | |
| Defendant | | |

_____

Plaintiff JULIE PERRINO states the following for her Verified Complaint against Defendant WEST CHESTER TOWNSHIP BOARD OF TRUSTEES:

**INTRODUCTION**

1. This is an Action under 42 USC § 1983 and 42 U.S.C. § 1988 for violations of the First Amendment of the United States Constitution.  Defendant WEST CHESTER BOARD OF TRUSTEES unlawfully discriminated against the viewpoints of Plaintiff JULIE PERRINO during its public participation portion of its meeting.  Specifically, when PERRINO attempted to address BOARD regarding concerns she has relating to matters at the local school district, BOARD refused to let her comment regarding those concerns.

1

After minutes of discussion, BOARD ultimately refused to let PERRINO speak claiming that PERRINO's comments were not related BOARD's business. However, BOARD permits other citizens to voice favorable viewpoints on matters not relating to its own business. Therefore, BOARD discriminated against PERRINO's viewpoints, relying upon a rule it does not enforce against others' viewpoints BOARD finds favorable.

## PARTIES

2. Plaintiff JULIE PERRINO ("PERRINO") is a resident of Butler County, OH.

3. Defendant WEST CHESTER BOARD OF TRUSTEES ("BOARD") is a public body located in Butler County, OH.

## JURISDICTION AND VENUE

4. Jurisdiction and venue are proper in this Court because this action is brought under 42 U.S.C. § 1983 and 42 U.S.C. § 1988, and the matters complained of occurred in Butler County, OH.

## BACKGROUND INFORMATION

5. PERRINO is a parent of a child in Lakota Schools.

6. The Lakota School District stretches across numerous public bodies.

7. West Chester Township falls within the Lakota School District, and at least one physical building falls within West Chester Township's borders.

8. BOARD is the governing body of West Chester Township.

9. Upon information and belief, the BOARD, either directly or indirectly, provides support and other services to Lakota School District, including providing resources officers to Lakota School District for public safety.

10. BOARD's members are West Chester's elected representatives and the viewpoints and opinions of the BOARD' members have influence and clout in the community on matters of public concern.

11. Within the recent year, Lakota School District has experienced much controversy concerning its Superintendent (Matt Miller) and accusations against him.

12. Specifically, someone in the public relaeased certain contraversial information regarding the Superintendent's sexual practices that resulted in investigations, news stories, and his eventual resignation.

(https://www.fox19.com/2023/01/20/board-members-crusade-against-lakota-superintendent-destroyed-my-career-he-says/).

13. Although the Butler County Sheriff's Department determined that there was no probable cause to charge Mr. Miller with a violation of criminal law, certain members of the communities within the District maintained that the Superintendent was not morally fit to lead the Lakota District, and they wanted him removed. (Id.)

14. These viewpoints and opinions remain a matter of great public concern within the Lakota School District and within West Chester Township.

15. PERRINO attended a meeting of the BOARD on December 20, 2022.

16. Although Lakota School District's superintendent is not directly employed by BOARD, BOARD either directly or indirectly, provides support and other services to Lakota School District, including providing resource officers to Lakota School District for public safety.

17. For example, West Chester Police are legally responsible to respond to calls concerning violence in all schools within its borders, and the police department would have the responsibility to investigate any allegations of inappropriate conduct involving students within its borders.

18. The BOARD is responsible for maintaining certain traffic calming measures that support the District.

19. As a result of the aforesaid, PERRINO believed it was both proper and necessary to publicly address BOARD, inform the members of the matters occurring at Lakota, and to call on them to use their offices in a manner she feels responsible under the circumstances.

20. When PERRINO attended BOARD's meeting, it was largely empty.

21. Only PERRINO and a few other people were in attendance.

22. At some point during the meeting, PERRINO was permitted to begin the process of addressing the BOARD on a matter of concern to her.

23. During the discussion, PERRINO's speech was not disruptive to the efficiency of BOARD's meeting.

4

24. When it became clear that PERRINO wished to speak on an issue related to Lakota School District's superintendent, BOARD immediately cut her off. (https://vimeo.com/783139263 at 47:00).

25. BOARD's members then had a very long conversation about whether it was going to permit PERRINO to deliver her comments. (Id.)

26. This discussion took much longer than the two minutes or so Perrino would have had to speak to the BOARD.

27. Ultimately, after this very long debate about whether to permit PERRINO to state her viewpoints, BOARD ultimately refused to let PERRINO share her viewpoints. (Id.)

28. PERRINO was told she could not speak on the topic, and she consequently could not do so without disrupting the meeting.

29. BOARD advised PERRINO that it would not let her discuss matters involving Lakota School District because BOARD alleged that the topic had no relationship to its official business.

30. However, BOARD did admit that it provides resource officers to Lakota School District.

31. In addition, BOARD wholly lacked actual knowledge of what PERRINO wanted to discuss on that occasion because it preemptively prevented her speech.

32. PERRINO could have demanded that BOARD cease the practice of providing a resource officer to Lakota School District.

33. PERRINO could have demanded that BOARD apply its influence to persuade the West Chester Township police department to investigate one or more matters of concern relevant to its school or to remain vigilant.

34. Indeed, one BOARD member conceded during the discussion that she had the ability to use her personal influence and her official status to discuss matters with school board members.  (Id.)

35. More importantly, BOARD was not making accurate or truthful statements about its relationship with the District even from its own perspective.

36. For example, on May 11, 2021, the Board invited a Lakota teacher to come into a meeting.  https://vimeo.com/548395905 at 1:40.

37. The BOARD gave this teacher a "Certificate of Recognition" because she was selected as the Ohio educator of the year.  (Id.)

38. The BOARD expressly thanked her for her commitment to education—especially preparing students to be active in government. (Id.)

39. The BOARD then invited the teacher to speak at the lectern.  (Id.)

40. The teacher explained at the lectern how she teachers about every single one of the Trustees on the BOARD. (Id. at 02:40).

41. She further discussed with the BOARD activities her government students were engaged in. (Id.)

42. The BOARD even requested that they pose with the teacher for a photograph, and then the BOARD had its picture taken with the teacher. (Id. at 04:16).

43. Therefore, the BOARD awards school employees for good work, let's those employees speak on work their students are doing during BOARD meetings, and then poses for photo opportunities with a school employee to highlight good work in the schools.

44. Nonetheless, BOARD instead preemptively silenced PERRINO's opinions and viewpoints about negative matters in the District.

45. Therefore, the BOARD attempts to state that although it considers highlighting good work in the schools as part of its business, listening to criticisms about bad work in the schools is in no way related to its business.

46. There is perhaps no clearer form of positive v. negative viewpoint criticism one could imagine.

47. In that same meeting, the BOARD had lengthy discussions about how important its school resource contract with the school was for its police force.

48. The BOARD approved its school resource officer contract with the Lakota district in that meeting. (Id., staring at 22:00).

7

49. The Administrator explained that the Resource Contract was a three-year contract lasting from 2021-2024, and the this contract had essentially exhibited for twenty years. (Id.)

50. The administrator continued that both parties through the agreement received "mutually beneficial" law enforcement services. (Id.)

51. The Agreement includes five West Chester officers circulating through the schools. (Id.)

52. The Agreement is worth over two million dollars that Lakota pays West Chester. (Id.)

53. The Administrator continued about how the West Chester Police Force obtains useful investigative information through this relationship.

54. The Board members then chimed in and discussed how important their relationship is with the Lakota District. (Id. at 23:45).

55. Trustee Wong started by telling a story about he talked to parents who brought to his attention concerns that their children were getting bullied in the school. (Id.)

56. Trustee Wong then explained how the officer is there to take confidential information reports. (Id.)

57. He continued how the BOARD's officer provide a very important function for the safety of "our students." (Id. at 24:20).

8

58. Trustee Becker then continued that it is a "very positive relationship." (Id.)

59. She stated that every school district building in West Chester has a West Chester officer in the building. (Id. at 24:30).

60. She also described this relationship as a "mutually beneficial" relationship between Lakota schools and the BOARD's police department. (Id.)

61. More to the point, Trustee Welch expressly stated that "this is one of the most important functions" that the Board does with its Police Department. (Id. at 24:50).

62. He continued that this relationship is "protecting those" who "are our future." (Id.)

63. Trustee Welch states that the police go in there, and "they build relationships." (Id.)

64. And Trustee Welch continued that they can use these relationships to determine if there is a "problem before there is a real problem." (Id.)

65. Therefore, even though the Board previously has called its relationship between its police force and Lakota Schools as one of the most important thing its force does, that the relationship between Lakota and West Chester is mutually beneficial, and that West Chester's relationship exists to ensure the students' safety, they told PERRINO that her criticisms that would have related to her concerns about student safety in Lakota schools was not related to its business.

9

66. This was just not a truthful reason to bar Perrino's viewpoints when these same Trustees previously bragged that its relationship with Lakota was one of the most important things it police force even does.

67. The BOARD merely wanted to silence PERRINO's viewpoints.

68. Furthermore, on multiple occasions in the past, BOARD has permitted others to speak on matters having much less to do with BOARD's official business.

69. For example, on September 13, 2022, a resident was permitted to discuss the Hopewell Chapter of the Daughters of the Revolution and was permitted to note that the week of September 17 was "constitution week." (See the September 13, 2022 meeting minutes attached as Exhibit 1).

70. This topic has no more to do with BOARD's official business than PERRINO's speech, but BOARD permitted the speaker to deliver her statements because the BOARD did not take issue with the viewpoints being expressed.

71. On July 12, 2022, a resident was permitted to discuss the upcoming Hoody Memorial Golf Outing and was further permitted to discuss scholarships related to that event. (See the July 12, 2022, meeting minutes attached as Exhibit 2).

72. This topic has no more to do with BOARD's official business than PERRINO's speech, but BOARD permitted the speaker to deliver the statements because BOARD did not take issue with the viewpoints being expressed.

73. On April 12, 2022, a resident explained the Hindu Festival of Colors as well as contributions which had been made by the Hindu culture. (See the April 12, 2022, meeting minutes attached as Exhibit 3).

74. Although promoting the Hindu culture is not anymore related to the BOARD than Perrino's speech, BOARD permitted this speech because the viewpoints being expressed did not upset the BOARD.

75. Thus, as confirmed by BOARD's meeting minutes, BOARD permits citizen comments on numerous matters and viewpoints that relate less to BOARD's business than PERRINO's intended speech here.

76. The Board took these actions as a quorum, the Board set a policy to discriminate against PERRINO's viewpoints, and BOARD was the final decisionmaker regarding whether it would permit PERRINO to express her viewpoints.

77. The BOARD presumably took these actions based upon its Rules of Public Participation. (Exhibit 4).

78. These Rules also facially regulate viewpoints or otherwise vague concepts.

79. Section 9 of the Rules, which is the Section that BOARD allegedly enforced against PERRINO, states the following:

> SECTION 9. Persons invited to speak at Meetings are required to do so in a **civil**, **respectful** manner and limit their comments to Township business or operations. The use of profane, **disrespectful** or threatening language or gestures will not be tolerated. (Id.) (emphasis added).

11

80. These rules are content-based and discriminate against viewpoints because they restrain speech that the BOARD finds disrespectful and not civil.

81. Thus, if the BOARD thinks your speech is not respectful to the BOARD or others, it can restrain your speech.

82. Considering that PERRINO's speech did relate to BOARD business, and the BOARD permits other people to express viewpoints less relevant to its business than PERRINO's, BOARD used these facially viewpoint-based rules to silence PERRINO's viewpoints.

83. BOARD treated PERRINO differently because it disagreed with the content that PERRINO wished to express, relying on a rule which was inconsistently applied and enforced based upon PERRINO's viewpoints, and a rule that facially restrains certain viewpoints the BOARD finds disrespectful.

### COUNT I – 42 U.S.C. § 1983 – FIRST AMENDMENT VIOLATION

84. PERRINO restates all previous paragraphs.

85. Public participation during the meetings of a public body constitutes a limited public forum, and the BOARD sets the policy and makes decisions regarding speech in its meetings.

86. Although a public body may enforce certain time, place, and manner restrictions on speech, those restrictions may not regulate viewpoints, they cannot be vague, and they cannot have overly broad application.

87. The application of BOARD's rules may not discriminate against viewpoints, and the BOARD cannot apply rules in a manner that discriminate against certain viewpoints.

88. Here, BOARD's rules are facially viewpoint-based because they regulate speech the BOARD finds disrespectful.

89. The BOARD's rules are unconstitutionally vague because they provide no objective standard as to what conduct would constitute "disrespectful" speech because "respect" is a subjective concept, so the public is not informed of what speech could or would violate these rules.

90. The BOARD's rules are overly broad and although they may have some proper applications, they also clearly have improper applications because the BOARD can restrain protective speech it finds subjectively "disrespectful."

91. Here, although BOARD frequently permits citizens to discuss matters that do not involve BOARD's official business, BOARD nonetheless discriminated against PERRINO because it disagreed with the viewpoints and content of PERRINO's speech.

92. Moreover, PERRINO's speech did relate to BOARD business because the BOARD is comprised of her elected officials, and the BOARD oversees matters that support Lakota schools, such as resource officers.

93. Regardless of the fact that PERRINO's speech does relate to BOARD business, the BOARD clearly applied its rules in a manner that discriminated against PERRINO's viewpoints.

94. BOARD's actions constitute an unlawful prior restraint of protected speech, and PERRINO is entitled to declaratory relief, injunctive relief, damages, attorney fees, and costs.

95. BOARD's Rules are facially unconstitutional, the Rules restrained PERRINO's speech unlawfully, and BOARD applied the Rules to PERRINO in manner that discriminated against her viewpoints.

**WHEREFORE**, Plaintiff respectfully requests that this Court find for her and award her the following relief:

a. An order enjoining Defendant BOARD from further viewpoint discrimination;

b. An order declaring the BOARD's rules facially violate the Constitution;

c. An order enjoining the enforcement of BOARD's unconstitutional rules;

d. Declaratory judgment holding that the BOARD violated Plaintiff's First Amendment rights;

e. Actual and nominal damages;

f. Attorney fees and costs under 42 U.S.C. § 1988; and

g. All other relief this Court deems proper.

Respectfully Submitted,

*/s/ Matt Miller-Novak*
Matthew Miller-Novak (0091402)
Steven C. Davis, Esq. (0065838)
Barron, Peck, Bennie & Schlemmer
3074 Madison Road
Cincinnati, Ohio 45209
(513) 721-1350
SCD@BPBSlaw.com
MMN@BPBSLaw.com

## VERIFICATION

I verify under oath and the penalty of perjury that the matters alleged in this Complaint are true to the best of my knowledge.

*Julie Perrino*
Julie Perrino

This Verified Complaint was signed in my presence on this 3rd day of February, 2023, in Hamilton County, OH.

_____
Notary

Matthew E. Miller-Novak, Attorney At Law
NOTARY PUBLIC - STATE OF OHIO
My commission has no expiration date
Sec. 147.03 R.C.

12